# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

MICHAEL JOHNSON and
STRONG LIFE LLC,

                Plaintiffs,

v.

FRANCHOICE, INC. and
CHRIS CYNKAR,

                Defendants.

Case No. 19-cv-1417 (MJD/ECW)

**REPORT AND RECOMMENDATION**

---

This matter is before the Court on Defendants' Motion for Partial Dismissal Pursuant to Rule 12(b)(6). (Dkt. 11.) This case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons discussed below, the Court recommends that Defendants' Motion for Partial Dismissal Pursuant to Rule 12(b)(6) be granted in part and denied in part.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

The operative Complaint alleges as follows: Michael Johnson is an individual citizen of Michigan and resides in Michigan. (Dkt. 1 ¶ 4.) Johnson formed Plaintiff Strong Life, LLC as the vehicle for acquiring for acquiring a franchise from non-party ILKB, LLC ("ILKB"), the franchisor of "iLoveKickboxing.com" franchises, which are fitness facilities dedicated to kickboxing, a form of physical fitness. (*Id.* ¶¶ 3-5.) At all relevant times, ILKB was a New York limited liability company with its headquarters in New York State. (*Id.* ¶ 7.) ILKB offered and sold franchises only in and from New York

State.  (*Id.*)

Johnson became interested in purchasing a franchise in 2015.  (*Id.* ¶ 10.)  Johnson had a call with Defendant Chris Cynkar ("Cynkar"), a franchise broker with Defendant FranChoice, Inc. ("FCI").  (*Id.* ¶ 11.)  Cynkar is an individual residing in Pittsburgh, Pennsylvania.  (*Id.* ¶ 6.)  FCI is a corporation formed under the laws of Minnesota, with its principal place of business in Eden Prairie, Minnesota.  (*Id.* ¶ 5.)  It is a franchise broker that assists prospective franchisees in identifying, investigating, selecting and acquiring franchises.  (*Id.*)  On July 22, 2016, Cynkar spoke with Plaintiffs to get a sense of what they were looking for in a franchise – namely, a business that they could own in an absentee or semi-absentee manner.  (*Id.* ¶ 11.)  Cynkar told Plaintiffs on this call that he was a franchise owner and entrepreneur, and that he "taught at Carnegie Mellon" in the area of business/entrepreneurship.  (*Id.*)  Cynkar also said that FCI conducts due diligence on the franchises they represent and that they are confident in the options they present.  (*Id.*)

Through its website (https://www.franchoice.com/), FCI held itself out as directing prospective franchisees to "high quality franchise businesses that match your requirements" and that it would match "entrepreneurs like you with the perfect franchise business."  (*Id.* ¶ 12.)  FCI stressed that Plaintiffs could "avoid the confusion of researching" franchise opportunities and could focus on those franchises that FCI had "selected . . . as franchise businesses matching [his] requirements."  (*Id.*)  FCI further represented that "[t]hey will be by your side coaching you and making sure you are getting the information you need in order to make the best decision for you."  (*Id.*)

On August 11, 2016, Johnson spoke with Cynkar about various franchise opportunities. (*Id.* ¶ 13.) Cynkar presented Johnson with four franchise concepts: Supercuts, ILKB, Mosquito Joe, and Deka Lash. (*Id.*) On this call, Cynkar also made a number of representations about the ILKB franchise opportunity including that: the total investment an ILKB franchisee needed to open for business was $200,000; ILKB franchisees break even in three months, with 200 to 225 members; no ILKB franchise had closed; most franchisees owned four or more locations; ILKB has "taken over all marketing" for franchisees and all marketing is done on the Internet; Johnson would make roughly $10,000 per month in profit; an ILKB franchise could be run by absentee owners; and the owners would not have to spend more than five to ten hours per week dealing with the business. (*Id.*)

Cynkar put Johnson in touch with ILKB, and ILKB repeated and elaborated upon the representations that Cynkar had made. (*Id.* ¶ 15.) As Johnson continued to meet and communicate with ILKB to discuss purchasing the franchise, he reported his discussions with ILKB to Cynkar, who "coached" him throughout those discussions toward a decision to purchase an ILKB franchise. (*Id.*)

In reliance upon the representations by FCI and Jones, Johnson signed a franchise agreement with ILKB for a unit to be located in Michigan and paid ILKB $49,999. (*Id.* ¶ 16.) In addition, Plaintiffs incurred substantial expenses building out, outfitting and equipping their studio and undertook substantial loan and lease obligations. (*Id.*) Plaintiffs opened the studio in Brighton, Michigan on October 23, 2017. (*Id.*)

FCI and Cynkar received a commission from ILKB for the sale of the franchise to

Johnson that was in excess of $30,000 of the $49,999 that Johnson paid ILKB.  (*Id.* ¶ 17.)

After opening the business, Plaintiffs learned that the representations that FCI and Cynkar had made to them relating to ILKB franchises were untrue, including learning that the representations that no ILKB studios had closed were false; that most franchisees did not own four or more locations; that ILKB did not handle all of a franchisee's marketing; Johnson did not reach the breakeven point in the third month and neither did most franchisees; representations regarding profitability were false; the costs related to opening a studio were higher than represented; and that absentee ownership is not a feasible model for an ILKB franchise.  (*Id.* ¶¶ 18-20.)

Defendants also failed to do or disclose their due diligence by not discovering or communicating to Plaintiffs the existence of lawsuits and a bankruptcy related to ILKB's founder and its affiliates.  (*Id.* ¶¶ 22-23.)  Plaintiffs assert that had they known of this information they would not have purchased any franchises from ILKB.  (*Id.* ¶ 23.)

Plaintiffs assert claims for relief against Defendants for their alleged violations of the New York Franchise Sales Act, N.Y. Gen. Bus. L. 680 *et seq.*; Michigan Franchise Investment Law, Mich. Comp. L. § 445.1501 *et seq.*; and the Minnesota Franchise Act, Minn. Stat. §80C.01 *et seq.*  Plaintiffs also assert claims against Defendants for common law fraud, fraud in the omission, and negligent misrepresentation.

Defendants move to dismiss Plaintiffs' New York Franchise Sales Act ("NYFSA"), Michigan Franchise Investment Law ("MFIL"), and Minnesota Franchise Act ("MFA") claims.

## II.    <u>LEGAL STANDARD</u>

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the pleadings are construed in the light most favorable to the non-moving party, and the facts alleged in the complaint must be taken as true.  *See Ashley County, Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009).  In addition, a court must afford the plaintiff all reasonable inferences from those allegations.  *See Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 853 (8th Cir. 2010).  At the same time, to withstand a motion to dismiss under Rule 12(b)(6), litigants must properly plead their claims under Federal Rule of Civil Procedure 8 and meet the principles articulated by the United States Supreme Court in *Iqbal* and *Twombly*.

Under Rule 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The pleading standard articulated by Rule 8 "does not require detailed factual allegations, but it [does demand] more than an unadorned, the-defendant-unlawfully-harmed-me-accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted).  A "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Thus, to "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting

5

*Twombly*, 550 U.S. at 556). "[T]he plausibility standard, which requires a federal court complaint to state a claim for relief that is plausible on its face, . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Ritchie v. St. Louis Jewish Light*, 630 F.3d 713, 717 (8th Cir. 2011) (internal quotation and citation omitted). "Determining whether a complaint states a plausible claim for relief will, . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted).

> Following *Twombly* and consistent with *Iqbal*, the Eighth Circuit explained:

> While a plaintiff need not set forth "detailed factual allegations," *Twombly*, 127 S. Ct. at 1964, or "specific facts" that describe the evidence to be presented, *Erickson v. Pardus*, 551 U.S. 89, 127 S. Ct. 2197, 2200 (2007) (per curiam), the complaint must include sufficient factual allegations to provide the grounds on which the claim rests. *Twombly*, 127 S. Ct. at 1965 n. 3. A district court, therefore, is not required "to divine the litigant's intent and create claims that are not clearly raised," *Bediako*, 354 F.3d at 840, and it need not "conjure up unpled allegations" to save a complaint. *Rios v. City of Del Rio*, 444 F.3d 417, 421 (5th Cir. 2006) (internal quotation omitted).

*Gregory v. Dillard's, Inc.*, 565 F.3d 464, 473 (8th Cir. 2009).

If matters outside the pleadings "are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). While matters "outside the pleadings" may not be considered in deciding a Rule 12 motion to dismiss, documents "necessarily embraced by the complaint are not matters outside the pleading." *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017). Thus, while courts primarily consider the allegations in the complaint in determining whether to grant a Rule 12(b)(6) motion, courts additionally consider matters incorporated by reference or integral to the claim, items subject to judicial notice, matters

6

of public record, orders, items appearing in the record of the case, and exhibits attached

to the complaint whose authenticity is unquestioned, without converting the motion into

one for summary judgment. *Id.*; *see also Miller v. Redwood Toxicology Lab, Inc.*, 688

F.3d 928, 931 n.3 (8th Cir. 2012).

## III.     ANALYSIS

### A.     Plaintiffs' Claim Under the New York Franchise Sales Act

According to Plaintiffs, FCI and Cynkar violated the NYFSA by making false

representations and omissions to him for the purpose of inducing him to purchase an

ILKB franchise.  (Dkt. 1, Count I.)  Defendants argue that the NYFSA claim fails as a

matter of law because they are not franchisors, and because they did not offer or sell any

franchise to Plaintiffs, given that it was non-party ILKB who offered and sold the

franchise at issue and the Complaint does not allege that Defendants offered or sold a

franchise to Plaintiffs on behalf of ILKB.  (Dkt. 13 at 7-10.)

Under New York law, "[t]he primary consideration of the courts in the

construction of statutes is to ascertain and give effect to the intention of the Legislature."

N.Y. Stat. Law § 92.  When the language of a statute is plain, courts are required to

follow its mandates.  *See Kimmel v. State*, 29 N.Y.3d 386, 392, 80 N.E.3d 370, 373

(2017) (concluding that courts under New York law should look "first to the plain

language of the statute[ ] as the best evidence of legislative intent") (quotation marks and

citation omitted); *Better World Real Estate Grp. v. New York City Dep't of Fin.*, 122

A.D.3d 27, 35, 992 N.Y.S.2d 247 (2014) (citations omitted) ("[C]ourts should construe

clear and unambiguous statutory language as to give effect to the plain meaning of the

words used.").  The NYFSA was enacted specifically to prevent, combat, and protect the

franchisee from rampant franchise sales fraud, it is remedial in nature, and therefore, is to

be liberally construed.  *See A.J. Temple Marble & Tile, Inc. v. Union Carbide Marble*

*Care, Inc.*, 162 Misc. 2d 941, 951, 618 N.Y.S.2d 155, 161 (Sup. Ct. 1994), *aff'd*, 214

A.D.2d 473, 625 N.Y.S.2d 904 (1995), *aff'd as modified*, 87 N.Y.2d 574, 663 N.E.2d 890

(1996) (citations omitted).  In that interpretative context, courts are obliged to

"'harmonize the various provisions' of a statute to achieve its legislative purpose." *Id.*

(citations omitted).

The NYFSA provides that the following conduct is unlawful:

2. It is unlawful **for a person, in connection with the offer, sale or purchase of any franchise**, to directly or indirectly:

(a) Employ any device, scheme, or artifice to defraud.

(b) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.  It is an affirmative defense to one accused of omitting to state such a material fact that said omission was not an intentional act.

(c) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

N.Y. Gen. Bus. Law § 687(2) (emphases added).  "A **person who offers or sells** a

franchise in violation of . . . [§ 687] is liable to the person purchasing the franchise for

damages and, if such violation as willful and material, for rescission, with interest at six

percent per year from the date of purchase, and reasonable attorney fees and court costs."

N.Y. Gen. Bus. Law § 691(1) (emphasis added).

1.    **Whether Defendants Are "Persons" Under the NYFSA**

While Defendants' arguments turn on the argument that it was ILKB as the franchisor who offered and sold the franchises at issue, that argument ignores the plain meaning of the NYFSA of who can be held liable under the Act.  Even assuming that ILKB is the franchisor, liability under the NYFSA is not limited to franchisors; rather it extends broadly to "person[s]," which is defined under the NYFSA as follows:

> "Person" means an individual, corporation, partnership, joint venture, association, company, trust, unincorporated organization or other entity and shall include any other person that has a substantial interest in or effectively controls such person, as well as the individual officers, directors, general partners, trustees or other individuals in control of the activities of each such person.

N.Y. Gen. Bus. Law § 681(13).  Indeed, Defendants, notwithstanding their contention that they did not offer to sell or in fact sell a franchise as required for liability under the NYFSA, do not contest that they are persons for the purposes of § 681(13).

2.    **Whether Defendants' Alleged Conduct Amounts to an "Offer" or an "Offer to Sell" Under the NYFSA.**

Plaintiffs argue that Defendants' conduct amounts to a solicitation to them to buy an ILKB franchise.  (Dkt. 17 at 11-12.)  Defendants' assertion that no liability can attach to them under the NYFSA, because there are no allegations in the Complaint that they sold or offered to sell an ILKB franchise to Plaintiffs, relies on an overly narrow construction of the term "offer" under the NYFSA.  The NYFSA defines "offer" as follows:

> "Offer" or "offer to sell" includes **any attempt to offer to dispose of, or solicitation of an offer to buy, a franchise or interest in a franchise for value**.  The terms "offer" and "offer to sell" do not include the renewal or

extension of an existing franchise where there is no interruption in the operation of the franchised business by the franchisee.

N.Y. Gen. Bus. Law § 681(11) (emphases added).

The word "solicitation" is not defined within the NYFSA. Under New York law, courts "are to construe words of ordinary import with their usual and commonly understood meaning, and in that connection have regarded dictionary definitions as 'useful guideposts' in determining the meaning of a word or phrase." *Rosner v. Metro. Prop. & Liab. Ins. Co.*, 96 N.Y.2d 475, 479-80, 729 N.Y.S.2d 658, 660 (2001) (citation omitted). The plain meaning of the word "solicitation" is found in the dictionary; it in relevant part, means the "act or an instance of requesting or seeking to obtain something" or "[a]n attempt or effort to gain business." *Solicitation, Black's Law Dictionary* (11th ed. 2019); *see generally, Wis. Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 223 (1992) ("'Solicitation,' commonly understood, means 'asking' for, or 'enticing to, something[.]") (citing *Black's Law Dictionary* (6th ed. 1990)).

Here, the Complaint alleges that FCI held itself out as directing prospective franchisees to high quality franchise businesses, and Cynkar represented that FCI "conducts due diligence on the franchises **they represent** and that they are confident with the options they present" (Dkt. 1 ¶¶ 11-12 (emphasis added)); Cynkar put Johnson in touch with ILKB (*id.* ¶ 15), and Cynkar "coached" Plaintiffs throughout their discussions with ILKB towards a decision to purchase an ILKB franchise (*id.*). Moreover, Cynkar allegedly made a number of representations regarding favorable reasons why Plaintiffs should purchase an ILKB franchise. (*Id.* ¶ 13). Given the NYFSA's broad language under § 687(2) prohibiting fraud "**in connection with** the offer, sale or purchase of any

10

franchise" and the statute's broad remedial purpose, the Court finds that Plaintiffs have plausibly alleged that FCI through Cynkar solicited from Plaintiffs an offer to buy an ILKB franchise, as evidenced by Cynkar's alleged representations set forth above, were made to entice an offer from Plaintiffs for an ILKB franchise. While Defendants argue that none of these solicitations amounted to an offer and that there are no plausible allegations of Defendants making a solicitation (Dkt. 13 at 11-12), this argument ignores the fact that the definition of an "offer" includes solicitation by Defendants of an offer from Plaintiffs to purchase a franchise, which is adequately alleged in the Complaint, as evidenced by the alleged numerous positive statements made by Cynkar as a whole regarding ILKB so that Defendants could ultimately receive a commission from ILKB for the sale. *See Reed v. Oakley*, 172 Misc. 2d 655, 658, 661 N.Y.S.2d 757, 759 (Sup. Ct. 1996), *aff'd*, 240 A.D.2d 991, 659 N.Y.S.2d 820 (1997) ("The conduct covered by the definition is not limited to the act of signing on the dotted line after the solicitation is made. Here, the solicitation and other negotiations were made prior to approval, and, by definition, amounted to an offer to sell prior to approval."). Simply put, Plaintiffs have adequately alleged for purposes of the NYFSA that Cynkar's communications, taken together, were seeking to obtain and entice from Plaintiffs an offer to purchase an ILKB franchise.

Again, Defendants' arguments focus on the fact that alleging that a franchise broker unrelated to a franchisor is not enough to establish liability under the NYFSA and that the Complaint does not allege that they are in the business of selling franchises or that they sold a franchise in this case. (Dkt. 13 at 7; Dkt. 19 at 3.) However, the NYFSA

separately defines "franchisor" as "a person who grants a franchise." N.Y. Gen. Bus. Law § 681(5). Had the New York Legislature only meant for liability to attach to franchisors, they simply could have defined a "Person" as a Franchisor consistent with § 681(5). Instead, as set forth above, they defined it expansively. Moreover, while the Court agrees that there is no dispute that the ultimate transaction involving the sale of the franchise was between ILKB and Plaintiffs, the word "solicit" does not confine itself to a franchisor and the ultimate act of the offer and acceptance, especially here where it is alleged that Defendants had a financial incentive to convince Plaintiffs to purchase an ILKB franchise. *See generally*, *Reed*, 172 Misc. 2d at 658 ("The conduct covered by the definition is not limited to the act of signing on the dotted line after the solicitation is made."); *Pinter v. Dahl*, 486 U.S. 622, 643 (1988)[1] (finding with respect to the Securities Act that "[u]nder these definitions, the range of persons potentially liable under § 12(1) is not limited to persons who pass title. The inclusion of the phrase 'solicitation of an offer

---

[1]    The Supreme Court went on to explain that:

> [B]rokers and other solicitors are well positioned to control the flow of information to a potential purchaser, and, in fact, such persons are the participants in the selling transaction who most often disseminate material information to investors. Thus, solicitation is the stage at which an investor is most likely to be injured, that is, by being persuaded to purchase securities without full and fair information.

*Id.* at 646-47. This is similar to the scenario alleged here, where "brokers" (Dkt. 1 ¶¶ 5, 9, 11) such as FCI are poised to control the information disseminated to prospective franchisees and it is at this solicitation stage where prospective franchisees are likely to be persuaded to purchase an ILKB franchise, especially where FCI's agents are allegedly acting as an independent source of information and Defendants are alleged to have received a significant commission (*Id.* ¶ 17), thereby nullifying any baseless assertion by Defendants that FCI and ILKB do not have a relationship.

to buy' within the definition of 'offer' brings an individual who engages in solicitation, an activity not inherently confined to the actual owner, within the scope of § 12.").

Defendants further argue that the remedies section of the NYFSA makes it clear that the NYFSA applies to franchisors not Defendants. (Dkt. 13 at 14-15.) The remedies provision of the NYFSA provides:

> A person who offers or sells a franchise in violation of section six hundred eighty-three, six hundred eighty-four or six hundred eighty-seven of this article **is liable to the person purchasing the franchise <u>for damages and,</u> if such violation as willful and material, for <u>rescission</u>**, with interest at six percent per year from the date of purchase, and reasonable attorney fees and court costs.

N.Y. Gen. Bus. Law § 691(1) (emphases added). Defendants argue that the language of Section 691 undercuts Plaintiffs' arguments that they can be held liable under the NYFSA because the remedy of rescission within this provision can only be granted through ILKB, the franchisor. (Dkt. 13 at 14-15.)

The fact that the NYFSA includes rescission along with damages as possible remedies does not mean that the NYFSA can only apply to franchisors or that a person cannot seek one remedy without seeking the other. Such an interpretation is contrary to the clear language of the statute. By way of example, there is no dispute that an employee of a "person" as defined under the NYFSA can be held liable under the NYFSA. *See* N.Y. Gen. Bus. Law § 691(3) (employees can be held liable to the same extent as an employer). However, under Defendants' argument, such an employee could not be held liable because obviously the employee, even if they are an employee of a franchisor, does not have the ability to effect a rescission. Simply put, Defendants' interpretation would rewrite the definition of "person" under the act to only mean a

13

franchisor.  Given the expansive scope as to what includes a "person" and "offer" under the plain language of the NYFSA, the fact that the statute was "enacted specifically to prevent, combat and protect the franchisee from rampant franchise sales fraud," *A.J. Temple Marble & Tile, Inc.*, 162 Misc. 2d at 951, and the need to harmonize the various provisions of the NYFSA to effectuate this purpose, *id.*, the Court finds that the intent of the New York Legislature was not only to punish franchisors but to ensure that brokers, such as FCI and their agents, are held accountable for the resulting harm to franchisees from their alleged fraudulent statements that franchisees acted in reliance on when deciding to purchase a franchise, even if the ultimate purchase is from a different party.

### 3.    Whether the Sale or Offer to Sell Occurred in New York.

Defendants also argue that dismissal of the NYFSA claim here is necessary under General Business Law § 683 because there are no allegations that Defendants or Plaintiffs have connections with New York or that any of the interactions between Plaintiffs and Defendants occurred in New York.  (Dkt. 13 at 12-14.)  Plaintiffs counter that the NYFSA applies in this case because FCI and Cynkar solicited Plaintiffs to purchase an ILoveKickBoxing franchise from ILKB, and ILKB accepted Plaintiffs' offer to buy in New York.  (Dkt. 17 at 13.)

"The New York Franchise Sales Act [ ], GBL §§ 680-695, governs franchise transactions, but only when the sale or offer to sell occurs in New York."  *EV Scarsdale Corp. v. Engel & Voelkers N. E. LLC*, 48 Misc. 3d 1019, 1028 (N.Y. Sup. Ct. 2015) (citing *A Love of Food I, LLC v. Maoz Vegetarian USA, Inc.*, 70 F. Supp. 3d 376, 393 (D.D.C. 2014), citing *JM Vidal, Inc. v. Texdis USA, Inc.*, 764 F. Supp. 2d 599, 616-17

(S.D.N.Y. 2011) ("[T]he NYFSA is applicable only to specific transactions solicited or accepted in New York, or affecting New York."), quoting *Century Pac., Inc. v. Hilton Hotels Corp.*, 2004 WL 868211, at *5 (S.D.N.Y. 2004)); *see generally,* N.Y. Gen. Bus. Law § 681(12)[2] (defining for the purposes of necessary disclosures under § 683 when an offer is made in New York).

In this case, the Complaint alleges that ILKB offered and sold franchises only in and from New York State and that ILKB accepted Plaintiffs' offer in New York.  (Dkt. 1 ¶¶ 7, 29.)  Given that the communications at issue allegedly induced Plaintiffs to ultimately make an offer to purchase a franchise in New York, which was accepted in New York, Plaintiffs' claim is governed by the NYFSA.

---

[2]    Section 681(12) provides:

(a) An offer or sale of a franchise is made in this state when an offer to sell is made in this state, or an offer to buy is accepted in this state, or, if the franchisee is domiciled in this state, the franchised business is or will be operated in this state.

(b) An offer to sell is made in this state when the offer either originated from this state or is directed by the offeror to this state and received at the place to which it is directed.  An offer to sell is accepted in this state when acceptance is communicated to the offeror from this state.

(c) An offer to sell is not made in this state merely because a publisher circulates or there is circulated on his behalf in this state a bona fide newspaper or other publication of general, regular and paid circulation which has had more than two-thirds of its circulation outside this state during the past twelve months, or a radio or television program originating outside this state is received in this state.

N.Y. Gen. Bus. Law § 681(12).

**4.    Conclusion**

For all of the reasons set forth above, Plaintiffs have adequately alleged a plausible claim against Defendants under the NYFSA and the Motion to Dismiss this claim should be denied.

**B.    Plaintiffs' Claim under the Minnesota Franchise Act**

According to Defendants, to be covered by the MFA, the sale or offer to sell had to be made in Minnesota. (Dkt. 13 at 17.) Defendants, relying upon Minn. Stat. § 80C.19, argue that the MFA cannot apply to Plaintiffs' claims because Plaintiffs have only identified a franchise unit located in Brighton, Michigan, not in Minnesota, and Cynkar is alleged to reside in Pennsylvania and only communicated to Plaintiffs (non-Minnesota residents) via email and the telephone. (*Id.* at 18 (citing Dkt. 1 ¶¶ 6, 11, 13-14, 16).) Plaintiffs counter with agency and respondeat superior theories, asserting that because Cynkar, a Pennsylvania resident,[3] is the agent of a Minnesota corporation, the offer originated from Minnesota for the purposes of the MFA. (Dkt. 17 at 22-24.)

Under Minnesota law:

No person may offer[4] or sell a franchise **in this state** by means of any written or oral communication which includes an untrue statement of a material fact or which omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

---

[3]    Plaintiffs do not plausibly allege or argue that Cynkar himself, outside of agency theory, took any actions aimed towards or from Minnesota relating to the present claims.

[4]    Similar to the NYFSA, under the MFA, "offer" and "offer to sell" "includes every attempt to offer to dispose of, and **every solicitation of an offer to buy**, a franchise or interest in a franchise for value." Minn. Stat. § 80C.01, subd. 16 (emphasis added).

Minn. Stat. § 80C.13, subd. 2 (emphasis added).

With respect to liability under § 80C.13, the MFA defines an offer to sell or a

purchase of a franchise "in this state" as follows:

> Subd. 1.  Applicable sales and offers to sell or purchase.  The provisions of
> sections 80C.01 to 80C.22 concerning sales and offers to sell shall apply
> when a sale or offer to sell is made in this state; when an offer to purchase is
> made and accepted in this state; or when the franchise is to be located in this
> state.
>
> Subd. 2.  Offer to sell or purchase made in state.  For the purpose of sections
> 80C.01 to 80C.22, an offer to sell or to purchase is made in this state, whether
> or not either party is then present in this state, when the offer originates from
> this state or is directed by the offeror to this state and received by the offeree
> in this state.
>
> Subd. 3.  Offer to purchase or sell accepted in state.  For the purpose of this
> section, an offer to purchase or to sell is accepted in this state when
> acceptance is communicated to the offeror in this state, and has not
> previously been communicated to the offeror, orally or in writing, outside
> this state; and acceptance is communicated to the offeror in this state,
> whether or not either party is then present in this state, when the offeree
> directs it to the offeror in this state reasonably believing the offeror to be in
> this state and it is received by the offeror in this state.
>
> Subd. 4.  Offer to sell or purchase not made in state.  An offer to sell or to
> purchase is not made in this state when the publisher circulates or there is
> circulated in the publisher's behalf in this state any bona fide newspaper or
> other publication of general, regular and paid circulation which is not
> published in this state, or when a radio or television program originating
> outside this state is received in this state.

Minn. Stat. § 80C.19.

The MFA "was adopted in 1973 as remedial legislation designed to protect

potential franchisees within Minnesota from unfair contracts and other prevalent and

previously unregulated abuses in a growing national franchise industry."  *Clapp v.*

*Peterson*, 327 N.W.2d 585, 586 (Minn. 1982) (citation omitted); *see also Martin*

*Investors, Inc. v. Vander Bie*, 269 N.W.2d 868, 872 (Minn. 1978). When the MFA was

introduced as a bill in 1973, it was described as a "bill to give the commissioner of

securities some control over the franchising business in the state of Minnesota." *In re Ne.*

*Exp. Reg'l Airlines, Inc.*, 228 B.R. 53, 59 (Bankr. D. Me. 1998) (quoting Hearing on the

Minnesota Franchise Act Before the Minnesota Senate, 68th Legis., Reg. Sess. (Minn.

1973) (statement by unidentified senator)). *Clapp*, relied upon by Defendants, dealt with

a technical violation of the MFA requiring a person offering or selling a franchise within

the state to register with the Commissioner of Securities a proposed public offering

statement making full disclosure of all facts required by statute or rules of the

commissioner. 327 N.W.2d at 586 (citing Minn. Stat. §§ 80C.02 (1980), 80C.04 (1980)

and 80C.06 (1980)). It rendered no analysis in its decision as to whether the defendant

was offering or selling a franchise within the state. *Martin Investors*, *supra*, only

involved a Minnesota-based franchisee where the defendant published advertisements for

consultants in at least two newspapers published within Minnesota; the agent of the

defendant discussed the proposed consultant arrangement in a long-distance telephone

call with an agent of the plaintiff, who was within Minnesota, and the defendant CCC

then mailed a sample copy of its standard consultant agreement to him in Minnesota. *See*

*Martin Investors*, 269 N.W.2d at 873. Based on these facts, the court concluded:

> Through these activities, CCC directly induced a Minnesota resident to enter
> a contractual relationship upon essentially all of the terms proposed in the
> sample consultant agreement forwarded to Faye but without the benefit of
> the full disclosure provided by the registration requirements of the Franchises
> Act. This is precisely the kind of activity that our act was designed to

> regulate and that must be subjected to the requirements of registration and
> full disclosure if the protective purposes of the act are to be realized.

*Id.* The Minnesota Supreme Court went on to reject the notion that an offer made in Minnesota needed to be shown in the "strictest sense of contract law" as requiring too narrow a reading of the MFA as a remedial statute. *Id.* at 873-74. Recently the Minnesota Court of Appeals noted that while the *Martin Investors* court "recognized the legislature's intent in adopting the MFA was to protect franchisees in Minnesota" it did "not address . . . the scope of the MFA."[5] *Cambria Co. LLC v. M&M Creative Laminants Inc.*, No. A18-1978, 2019 WL 3543602, at *2 (Minn. Ct. App. Aug. 5, 2019).

One court in this district has characterized territorial applicability of the MFA as "murky." *Wave Form Sys., Inc. v. AMS Sales Corp.*, 73 F. Supp. 3d 1052, 1062 (D. Minn. 2014). Indeed, courts examining the issue have reached inconsistent results. For example, in *Healy v. Carlson Travel Network Associates, Inc.*, 227 F. Supp. 2d 1080 (D. Minn. 2002), the court rejected an argument similar to the one being presented by Plaintiffs:

> Healy urges that the statute applies because the offer to sell the franchise
> came from an agent of Carlson, a Minnesota corporation. No authority is
> cited for the proposition that the MFA applies merely because the franchisor
> is a Minnesota corporation. Healy concedes that Crider, the Carlson agent
> he contacted for information and with whom he negotiated the sale, was
> based in Florida. The newspaper advertisement for Carlson franchise
> opportunities that Healy responded to, was placed in the Chicago Tribune by
> Crider's office in St. Petersburg, Florida. The Agreement was presented to
> and signed by Healy in Illinois. Healy has not demonstrated that the MFA
> applies to his case.

---

[5]    In *Cambria*, the Court considered, but ultimately declined, a request to certify the following question: "May a non-Minnesota resident claiming to be a franchisee invoke the provisions of the Minnesota Franchise Act where its only connection with Minnesota is the location of the purported franchisor?" 2019 WL 3543602, at *2.

*Id.* at 1088; *see also Klosek v. Am. Express Co.*, No. CIV. 08-426 JNE/JJG, 2008 WL 4057534, at *21 (D. Minn. Aug. 26, 2008), *aff'd*, 370 F. App'x 761 (8th Cir. 2010) ("As the statute indicates, the geographic limits do not apply to the entire MFA, but only to 'the provisions concerning sales and offers to sell.'") (quoting Minn. Stat. § 80C.19, subd. 1) (cleaned up).[6]

At least one court has held that "even where a party to a 'franchise agreement' is a Minnesota corporation, the agreement is not within the purview of the MFA if the franchisee is not located in and does not operate in Minnesota." *Johnson Bros. Liquor Co. v. Bacardi U.S.A., Inc.*, 830 F. Supp. 2d 697, 703 (D. Minn. 2011) (citing *Hockey Enters., Inc. v. Total Hockey Worldwide, LLC*, 762 F. Supp. 2d 1138, 1146 (D. Minn. 2011)).  The basis of the court's holding was that the "MFA applies only to 'franchise agreements' within the purview of Minnesota law.  Minnesota cannot regulate 'franchise agreements' that are formed and preformed in other states."  *Id.* (citing *In re St. Paul & K.C. Grain Co.*, 89 Minn. 98, 94 N.W. 218, 225 (Minn. 1903) (noting that "general rule" is that state statutes apply only to territory of state that enacted the statute)).

---

[6]    The Court in *Klosek*, distinguished the facts in that case from those in *Healey* as follows:

> And though Ameriprise urges otherwise, it appears that *Healy* chiefly involved misrepresentations in the sale of a franchise, and not other complaints under the MFA.  *See id.* at 1083-84.  Because the current litigation does not involve a sale or offer to sell, it is distinguishable from *Healy*.

2008 WL 4057534, at *21.

In *Candleman Corp. v. Farrow*, No. 9802463, Bus. Franchise Guide (CCH) § 11,635, 1999 WL 35768614 (D. Minn. Feb. 1, 1999), the court found that the MFA applied to the facts in that case because (1) the franchisor's offer to sell the franchise originated from the franchisor's Minnesota office; (2) the acceptance of the offer was received by the franchisor in Minnesota; and (3) the franchise agreement's choice of law provision provided for Minnesota law.  *Id.*

In *Wave Form*, *supra*, the plaintiff, an Oregon company, asserted that the MFA applied to its agreement with a Minnesota manufacturer, because the manufacturer's offer to sell originated from Minnesota and acceptance of that offer was received by AMS in Minnesota.  73 F. Supp. 3d at 1059.  The plaintiff argued that the "originated from" language was met when the manufacturer transmitted the agreement from its office in Minnesota to Wave Form in Oregon, and the "received by the offeree in this state" language was satisfied when Wave Form executed and subsequently returned the agreement to AMS in Minnesota for its signature.  *Id.* at 1060.  In an order on a motion for a preliminary injunction, the court found that "Wave Form's position, while it is seemingly a fair construction of the statutory language, fails to account for the MFA's territorial application that was intended by the legislature," and reaffirmed that the "legislative intent behind the passage of the [Franchise Act] was to protect Minnesota franchisees located within Minnesota."  *Id.* (citing *Martin Investors*, 269 N.W.2d at 872). Ultimately, the Court held as follows with respect to whether the plaintiff was likely to prevail on its MFA claim:

> At present, whether Wave Form will likely succeed on the merits of its claim is uncertain.  The entirety of Wave Form's position rests on the applicability

of the MFA.  While a construction of the language of the statute does support Wave Form's position, the Minnesota nexus with the factual predicate is very minimal.  Other than receiving an offer transmitted from Minnesota and then remitting acceptance back to Minnesota, Wave Form has had no contact with Minnesota.  Wave Form has never had a single sale in this state nor does it have any physical presence here.  While Wave Form does conduct business in states outside of Oregon, it is undisputed that Minnesota is not one of them.  To construe the MFA broadly enough to apply here given the facts currently of record in this case is a stretch.

*Wave Form*, 73 F. Supp. 3d at 1061.

This Court's decision must be informed foremost by the plain language of the MFA.  *See Am. Tower, L.P. v. City of Grant*, 636 N.W.2d 309, 312 (Minn. 2001).  Here, the pertinent portion of § 80C.19, dealing with offers made in this state provides:

Offer to sell or purchase made in state.  For the purpose of sections 80C.01 to 80C.22, an offer to sell or to purchase is made in this state, whether or not either party is then present in this state, **when the offer originates from this state** or is directed by the offeror to this state and received by the offeree in this state.

Minn. Stat. § 80C.19, subd. 2 (emphasis added).  There is nothing in the language of the statute suggesting that the MFA cannot apply to a foreign franchisee when the offer, in this case a solicitation, "originates" from Minnesota.  The Court in *Wave Form* conceded that this was "seemingly a fair construction of the statutory language," 73 F. Supp. 3d at 1060, before ignoring that same language and concluding that the legislative intent behind the passage of the MFA was to protect Minnesota franchisees located within Minnesota.  There is nothing in the MFA remotely carving out such an exception.  Indeed, in 1981, the legislature added an exemption to the MFA's registration requirements under Minn. Stat. § 80C.02, exempting any "offer or sale of a franchise to a resident of a foreign state, territory, or country who is neither domiciled in this state nor

22

actually present in this state, if the franchise business is not to be operated wholly or partly in this state, and if the sale of this franchise is not in violation of any law of the foreign state, territory, or county concerned." Minn. Stat. § 80C.03(h) (1981 Supp.). Had the legislature desired a similar carve-out regarding the prohibitions set forth in Minn. Stat. § 80C.13 for franchises located outside of the state of Minnesota, it could have included a similar exemption within Section 80C.03. If the statutory language were construed as urged by Defendants, Minnesota would be without authority to enforce its franchise laws against a business located physically within Minnesota, but which directed its fraudulent efforts towards non-residents **from** within Minnesota. It is unlikely that the legislature intended such a result. Instead, the focus, based on the plain language of the statute is on the nexus of the conduct—whether the solicitations at issue originated from Minnesota. *See Candleman*, Bus. Franchise Guide (CCH) § 11,635, 1999 WL 35768614. Such an interpretation is most consistent with the language of the MFA and the general rule that Minnesota statutes are to apply to conduct within its borders.

However, the Court cannot interpret the MFA so broadly that it will apply to a Minnesota company, such as FCI, even through a theory of respondeat superior or agency as argued by Plaintiffs (Dkt. 17 at 22-24), if none of the illegal acts complained of originated from Minnesota. *See Healy*, 227 F. Supp. 2d at 1088. The Court will not rewrite the MFA to encompass such acts, regardless of its remedial nature.

The only allegations in the Complaint regarding Cynkar are that he is an agent of FCI and that he resided and is a citizen of Pennsylvania. (Dkt. 1 ¶ 6.) There are no factual allegations in the Complaint suggesting that the operative solicitations at issue

23

originated from Minnesota, including that Cynkar made the representations while in Minnesota.  Under the doctrine of respondeat superior, "'the act of an agent within the scope of his agency is the act of his principal.  The principal is liable because the law attributes to him the act of his agent, with the result that both are liable jointly and severally to the person injured by the wrongful act.'"  *D.W. v. Radisson Plaza Hotel Rochester*, 958 F. Supp. 1368, 1380 (D. Minn. 1997) (quoting *Melady v. South St. Paul Live Stock Exch.*, 142 Minn. 194, 171 N.W. 806, 807 (1919)) (cleaned up).  Even assuming that these doctrines apply to the MFA, they only impute the acts of Cynkar back to FCI in Minnesota for purposes of liability and do not speak to what matters for the purposes of the MFA—whether the malfeasance at issue originated from Minnesota. It would be a closer question if the Complaint alleged that someone from within FCI in Minnesota directed Cynkar to make the specific alleged solicitations to Plaintiffs. However, that is not the case here.[7]

For all of these reasons, the Court finds that Plaintiffs' MFA claim should be dismissed.

---

[7]    Plaintiffs asked that, if the Court finds the Complaint does not state a claim under the MFA, the Court give Plaintiffs leave to amend on the basis of an Independent Consultant Agreement between FCI and its consultants regarding certain generalized procedures and requirements.  (Dkt. 17 at 21.)  However, even if there is such an agreement, it does not mean that the representations originated in Minnesota, as it does not change the fact that it is not alleged that Cynkar himself made the operative allegedly fraudulent solicitations at issue from within Minnesota.

**C.    Plaintiffs' Claims Under the Michigan Franchise Investment Law**

Defendants argue that they are not covered by the MFIL as evidenced by the fact that that the remedies section of the Act makes it clear that the MFIL applies to franchisors, not Defendants.  (Dkt. 13 at 16.)

Courts have acknowledged that the MFIL is to be "'broadly construed to effectuate its purpose of providing protection to the public.'"  *Little Caesar Enters. v. Dep't of Treasury*, 226 Mich. App. 624, 575 N.W.2d 562, 564 (Mich. Ct. App.1997) (quoting Mich. Comp. Laws § 445.1501).  Courts interpreting the MFIL have observed "the general purpose of the MFIL is to protect the rights of franchisees."  *Franchise Mgmt. Unlimited, Inc. v. America's Favorite Chicken*, 221 Mich. App. 239, 561 N.W.2d 123, 127 (Mich. Ct. App. 1997) (citations omitted).  The MFIL has been described as a "comprehensive and paternalistic" law representing Michigan public policy.  *See Banek Inc. v. Yogurt Ventures U.S.A., Inc.*, 6 F.3d 357, 362 (6th Cir. 1993).  That said, courts may "not imply a private right of action to remedy violations of the MFIL" where one is not set forth in the Act.  *Franchise Mgmt. Unlimited*, 221 Mich. App. at 252, 561 N.W.2d at 129 (citing Mich. Comp. Laws § 445.1534).

To this end, the MFIL prohibits the following fraudulent practices:

A **person** shall not, **in connection with the** filing**, offer, sale, or purchase of any franchise**, directly or indirectly:

(a) Employ any device, scheme, or artifice to defraud.

(b) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

(c) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

Mich. Comp. Laws § 445.1505 (emphases added). The MFIL contains similar definitions for "person" and "offer" as the NYFSA:

> "**Offer" or "offer to sell" includes** an attempt to offer to dispose of or **solicitation of an offer to buy**, a franchise or interest in a franchise for value. The terms defined in this act do not include the renewal or extension of an existing franchise where there is no interruption in the operation of the franchised business by the franchisee.
>
> * * *
>
> "**Person**" means an individual, corporation, a partnership, a joint venture, an association, a joint stock company, a trust, or an unincorporated organization.

Mich. Comp. Laws Ann. § 445.1503 (3), (5) (emphases added)

The remedies provision relied upon by Defendants provides:

> (1) **A person who offers or sells a franchise in violation of section 5 or 81 is liable** to the person purchasing the franchise **for damages <u>or</u> rescission**, with interest at 6% per year from the date of purchase until June 20, 1984 and 12% per year thereafter and reasonable attorney fees and court costs.
>
> (2) A person may not file or maintain suit under this section if the franchisee received a written offer before suit and at a time when the franchisee owned the franchise to refund the consideration paid together with interest from the date of purchase at 1 percentage point above the rate provided by subsection (1), less the amount of income received on the franchise, conditioned only upon tender by the person of all items received by the franchisee for the consideration and not sold, and failed to accept the offer within 30 days of its receipt, or if the franchisee received the offer before suit and at a time when the franchisee did not own the franchise, unless the franchisee rejected the offer in writing within 30 days of its receipt. The rescission offer shall recite the provisions of this section. If the franchise involves substantial building or substantial equipment and a significant period of time has elapsed since the sale of the franchise to the franchisee, the rescission offer may recognize depreciation, amortization, and other factors which bear upon the value of the franchise being returned to the franchisor.

Mich. Comp. Laws § 445.1531 (emphases added).  Defendants argue that the language of
Section 445.1531 undercuts Plaintiffs' arguments that they can be held liable under the
MFIL because the remedy of rescission within this provision can only be granted through
ILKB, the franchisor.  (Dkt. 13 at 16-17.)

Under Michigan law, the "principal goal of statutory interpretation is to give effect
to the Legislature's intent, and the most reliable evidence of that intent is the plain
language of the statute." *S. Dearborn Envtl. Improvement Ass'n, Inc. v. Dep't of Envtl.
Quality*, 502 Mich. 349, 360-61, 917 N.W.2d 603, 608 (2018).  When interpreting a
statute, courts "must give effect to every word, phrase, and clause and avoid an
interpretation that would render any part of the statute surplusage or nugatory." *Id.*
(quotation marks and citations omitted).  "Moreover, "[n]ontechnical words and phrases"
should be construed according to their plain meaning, taking into account the context in
which the words are used." *Id. (quoting People v. Rea*, 500 Mich. 422, 428, 902 N.W.2d
362 (2017)).  "When a word or phrase is not defined by the statute in question, it is
appropriate to consult dictionary definitions to determine [its] plain and ordinary
meaning." *Id.* at 361, 917 N.W.2d at 608-09 (quotation marks and citation omitted).

The fact that the MFIL includes rescission, along with damages, as possible
remedies, does not mean that the MFIL can only apply to franchisors or that a person
cannot seek one remedy without seeking the other.  Such an interpretation is contrary to
the clear language of the statute.  By way of example, there is no dispute that an
employee of a "person" as defined under the MFIL can be held liable under the MFIL.
*See* Mich. Comp. Laws § 445.1532 (employees can be held liable to the same extent as

an employer).  However, under Defendants' argument, such an employee could not be

held liable because obviously the employee, even if they are an employee of a franchisor,

does not have the ability to effect a rescission.  Defendants rely on language from the

MFIL which provides, "[t]his act applies to all written or oral arrangements between a

franchisor and franchisee in connection with the offer or sale of a franchise . . ." for the

proposition that the act was meant to apply to the relationship between Plaintiffs and

ILKB, and has nothing to do with FCI.  (Dkt. 19 at 7-8 (citing Mich. Comb. L. §

455.1504(1)).)  There is no dispute that the MFIL's purpose is to protect franchises from

abuses as it relates to entering into franchise agreements, including possible abuses "in

connection with the offer or sale of a franchise."  Mich. Comb. L. § 455.1504(1).  Such a

purpose is consistent with the claims of fraudulent solicitations against Defendants made

in connection of a sale of ILKB franchise, especially as alleged here, where it is alleged

that Defendants, holding themselves out as independent, ultimately received the large

majority of the commission from the sale of the ILKB franchise to Plaintiffs.  (Dkt. 1 ¶¶

12, 17.)  Moreover, Defendants' interpretation would rewrite the definition of "person"

under the act to only mean a franchisor.  Indeed, the MFIL separately defines

"franchisor" as "a person who grants a franchise" and utilizes the term in conjunction

with the record keeping requirements.  Mich. Comb. L §§ 445.1502(5), 445.1520.  Had

the Michigan Legislature only meant for liability to attach to franchisors, they simply

could have defined a "Person" as a Franchisor consistent with § 445.1502(5).  Instead, as

set forth above, they defined it expansively.  Given the expansive scope as to what

includes a "person" and "offer" under the plain language of the MFIL, the fact that the

statute was enacted "to protect the rights of franchisees," *Franchise Mgmt. Unlimited*, 561 N.W.2d at 127, and the need to give effect to every word and phrase, *S. Dearborn Envtl. Improvement Ass'n*, 917 N.W.2d at 608, the Court finds that the intent of the Michigan Legislature was not only to punish franchisors but to ensure that brokers, such as FCI and their agents, are held accountable for the resulting harm to franchisees from their alleged fraudulent statements that franchisees acted in reliance on when deciding to purchase a franchise, even if the ultimate purchase is from a different party.

## IV.    RECOMMENDATION

Based on the above, and on the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendants' Motion for Partial Dismissal Pursuant to Rule 12(b)(6) (Dkt. 11) be **GRANTED** in part and **DENIED** in part as follows:

1.    Defendants' Motion for Partial Dismissal Pursuant to Rule 12(b)(6) (Dkt. 11) be **GRANTED** as to Plaintiffs' claim under the Minnesota Franchise Act, and that the claim be **DISMISSED WITHOUT PREJUDICE**; and

2.    Defendants' Motion for Partial Dismissal Pursuant to Rule 12(b)(6) (Dkt. 11) be **DENIED** as to Plaintiffs' claims under the New York Franchise Sales Act and the Michigan Franchise Investment Law.

DATED: December 19, 2019                    *s/ Elizabeth Cowan Wright*
ELIZABETH COWAN WRIGHT
United States Magistrate Judge

## <u>NOTICE</u>

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).