# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

MICHAEL JOHNSON and
STRONG LIFE LLC,

            Plaintiffs,

v.

FRANCHOICE, INC. and
CHRIS CYNKAR,

            Defendants.

Case No. 19-cv-1417 (MJD/ECW)

**ORDER**

---

This matter is before the Court on Plaintiffs' Motion to Amend Complaint (Dkt. 65) ("Motion").  For the reasons stated below, the Motion is denied.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.    General Background

Plaintiffs initiated this case on May 29, 2019 along with the contemporaneous filing of several related cases (involving different plaintiffs) against Defendant FranChoice, Inc. ("FCI"), a franchise broker, and a number of its agents, including Defendant Chris Cynkar ("Cynkar"), related to their referral of a franchise opportunity to Plaintiffs involving non-party ILKB, LLC ("ILKB"), the franchisor of "iLoveKickboxing.com" franchises.  (*See* Dkt. 1.)

The Complaint contained a claim for common law fraud.  (*Id.* ¶¶ 37-41.) Defendants filed a Motion for Partial Dismissal of the Complaint on June 28, 2019.  (Dkt.

11.)  However, Defendants did not move to dismiss the fraud-related claim for a lack of

particularity under Rule 9(b).  (*See* Dkt. 13.)

## B.    The Parties' Joint Discovery Plan and the Court's Scheduling Orders

On May 14, 2019, counsel for both parties developed and filed a Joint Discovery

Plan applicable not only to the similar cases that existed at that time but also to the cases

that were expected to be filed shortly thereafter, such as the present case.  (*See Mount*

*Holly Kickboxing LLC v. FranChoice, Inc.*, Case No. 19-cv-300 (MJD/ECW), Dkt. 24.)

The Joint Discovery Plan provided in relevant part as follows:

> The parties have collectively identified the following factual issues which
> should be common to all cases in ILKB Franchisee Claims- Wave I and
> ILKB Franchisee Claims- Wave II:
>
> * * *
>
> (3) the role of FranChoice and its consultants generally in assisting
>     franchisee candidates in their quest for franchise opportunities;
>
> (4) FranChoice's guidelines, directions, protocols, and marketing
>     representations to franchisee candidates with respect to FranChoice's role
>     and its compliance with any applicable franchise sales laws;
>
> (5) FranChoice's procedures in working with franchisee candidates
>     generally;
>
> (6) the basis for FranChoice's representations regarding their role and
>     expertise in assisting franchisee candidates find franchise opportunities;
>
> (7) the franchisor business of ILKB, LLC;
>
> * * *
>
> With regard to the above common fact issues, the parties agree that there is
> not a need for duplication of discovery efforts.  Accordingly, the parties agree
> that[:]
>
> (a) Plaintiffs in the Mt. Holly Kickboxing case will promptly serve
>     documentary discovery on the common factual issues set forth above

2

which are part of the discovery allowed below under "Additional Joint Discovery Issues," Section 2(b).  As with all discovery of common fact issues, responses to that discovery may be used in ILKB Franchisee Claims- Wave I and ILKB Franchisee Claims –Wave II.

(b)  After sufficient documentary discovery is completed, one 30(b)(6) deposition of FranChoice will be conducted regarding the above common factual issues in ILKB Franchisee Claims- Wave I and ILKB Franchisee Claims- Wave II; and(c)

After sufficient documentary discovery is completed, one 30(b)(6) deposition of non-party ILKB, LLC will be conducted regarding the above factual issues in ILKB Franchisee Claims- Wave I and ILKB Franchisee Claims- Wave II.

(*Id.* at 3-4.)  Plaintiffs began propounding written discovery in May 2019.  (*See*, *e.g.*, Dkt. 72-1.)

Subsequently, while the Motion for Partial Dismissal was pending, the Court issued a Pretrial Scheduling Order in the present matter on September 4, 2019, which set the following relevant deadlines:

The parties must commence fact discovery procedures in time to be completed on or before **July 1, 2020**.

\* \* \*

1. Except as otherwise specifically set forth this section, all motions that seek to amend the pleadings or to add parties must be filed and served **within 30 days of the Report and Recommendation on the pending motion to dismiss**.

2. All motions that seek to amend the pleadings to include punitive damages, if applicable, must be filed and served on or before **October 1, 2019**.

3. Except as otherwise specifically set forth this section, all non-dispositive motions and supporting documents, including those that relate to fact discovery, shall be filed and served on or before **July 20, 2020**.

(Dkt. 28 at 2, 4 (emphases in original).)  The Report and Recommendation on the partial motion to dismiss was issued on December 19, 2019 (Dkt. 46), making the deadline to amend the pleadings January 18, 2020.

An Amended Pretrial Scheduling Order was issued by the Court on February 5, 2020.  (Dkt. 54.)  Fact discovery was extended to **January 4, 2021**.  (*Id.* at 2.) Otherwise, the relevant deadlines remained the same.

A Second Amended Scheduling Order was issued on November 10, 2020.  (Dkt. 77.)  Fact discovery was extended to **March 4, 2021**.  (*Id.* at 2.)  Non-dipositive motions relating to fact discovery were extended to **June 15, 2020**.  (*Id.*)  Dispositive motions were extended to **June 20, 2021**.  (*Id.* at 2.)  Otherwise, the relevant deadlines remained the same.  (*Id.*)

## C.    First Motion to Amend to Add Punitive Damages

Plaintiffs previously filed a timely motion to amend the Complaint to add a claim for punitive damages.  (Dkt. 31.)  The only substantive addition to the Complaint was Count VII seeking punitive damages.  This proposed count incorporated the allegations in the preceding paragraphs and then alleged as follows:

> Defendants deliberately and intentionally disregarded the rights of Plaintiffs and disregarded the substantial likelihood of serious injury and damages to Plaintiffs by representing that they offered to match Plaintiffs only with franchises that Defendants had investigated and vetted; that such franchises were of high quality; and that Defendants would provide Plaintiffs with all knowledge necessary to make an informed decisions [sic], when, in fact:
>
> - Defendants knew that the founder of ILKB, Michael Parrella, had filed for bankruptcy in 2003 and that his discharge had been vacated in 2008; and knew or should have known, in the exercise of reasonable inquiry of Parrella's bankruptcy consistent with their representations

to Plaintiffs, that Parrella's discharge had been revoked for failure to pay federal taxes and that there were two adversary proceedings in the bankruptcy accusing Parrella of fraud and fraudulent transfers.

- Defendants failed to perform any serious, systematic or professional due diligence upon ILKB; instead all they did was talk to a few existing franchisees, many of whom did not own the type of ILKB franchise that Plaintiffs were considering buying, and Defendants prepared no report, summary or investigation of ILKB.

- Defendants simply took representations of ILKB about the nature of the franchise, including the representations that it was suitable for absentee ownership; that no units had closed; that average ILKB franchisees made revenues and profits at a certain level; and that ILKB did all of the marketing for franchisees, and passed them on to Plaintiffs without checking on them.

- Defendants knew that ILKB engaged in blatantly illegal marketing techniques as early as March 2015 and never questioned whether such techniques had ceased, thus exposing Plaintiffs to the high likelihood, if not certainty, that Plaintiffs would be the victims of fraud.

- Defendants disregarded complaints and warning signs from ILKB franchisees as the whining of "stupid, selfish and ungrateful franchisees" instead of investigating such complaints and determining whether they were true.

- Defendants made specific representations as set forth in the proposed second amended complaint about ILKB without investigating or verifying them, when such representations were false and were known or should have been known to Defendants as false.

(Dkt. 33-2 ¶ 59.)

On May 6, 2020, the Court granted in part and denied in part the motion, allowing only the following allegations in support of the proposed Count VII for punitive damages to be added:

Defendants deliberately and intentionally disregarded the rights of Plaintiffs and disregarded the substantial likelihood of serious injury and damages to Plaintiffs by representing that they offered to match Plaintiffs only with franchises that Defendants had investigated and vetted; that such franchises were of high quality; and that Defendants would provide Plaintiffs with all knowledge necessary to make an informed decisions [sic], when, in fact:

- Defendants made specific representations as set forth above about ILKB without investigating or verifying them, when such representations were false and were known or should have been known to Defendants as false.

As a result of Defendants' deliberate disregard of Plaintiffs' rights, Plaintiffs are entitled to punitive damages.

(Dkt. 55 at 21 (alteration in original).)  In this regard, the Court allowed Plaintiffs to

claim punitive damages solely regarding the misrepresentations about ILKB that:

[T]he total investment an ILKB franchisee needed to open for business was $200,000; ILKB franchisees break even in three months, with 200 to 225 members; no ILKB franchise had closed; most franchisees owned four or more locations; ILKB has "taken over all marketing"; Johnson would make roughly $10,000 per month in profit; and an ILKB franchise could be run by absentee owners, all go to the financial viability of an ILKB franchise.

(*Id.* at 19.)

As part of its ultimate decision, the Court also found as follows:

The Court also agrees with Defendants that allegations in the proposed amended complaint regarding representations made by Defendants to Plaintiffs offering to match them "only with franchises that Defendants had investigated" and then not conducting "any serious, systematic or professional due diligence upon ILKB" or taking ILKB's representations at face value at most amounts to gross negligence on the part of Defendants as to their duty to Plaintiffs.  However, the mere showing of negligence, even gross negligence, is not sufficient to sustain a claim of punitive damages.  *See Ulrich*, 848 F. Supp. at 868.  Moreover, there are no allegations, save for the alleged illegal marketing (addressed below), that would have given Defendants reason not to believe ILKB's representations so as to create a high probability of harm to Plaintiffs.

(*Id.* at 17.)  In addition, the Court rejected a claim for punitive damages based on the assertion that Defendants discounted franchisee's complaints as the whining of "stupid, selfish and ungrateful franchisees" because the allegations did not set forth what those complaints entailed and how they bore on the Defendants' alleged misconduct with respect to Plaintiffs so as to find that Defendants' disregard created a high probability of harm to Plaintiffs.  (*Id.* at 18.)

On May 19, 2020, Plaintiffs objected to this Court's Order on punitive damages. (Dkt. 56.)  No mention was made at this time that another amendment would be necessary.

On June 15, 2020, Senior United States District Judge Michael J. Davis affirmed the Order on punitive damages.  (Dkt. 58.)

## D.     Motions for Summary Judgment

In a related matter against FCI involving the same Plaintiffs' legal counsel, *Mount Holly Kickboxing LLC v. FranChoice, Inc.*, Case No. 19-cv-300 (MJD/ECW), on April 28, 2020, the plaintiffs in that case moved for summary judgment on their claim under the North Carolina Deceptive and Unfair Trade Practices Act claim.  (*See* Case No. 19-cv-300, Dkt. 57.)  In their May 19, 2020 opposition, FCI asserted that "while [plaintiffs'] Complaint mentions some of the website statements, it does not identify them as misrepresentations—rather they appear to be identified in an effort to establish reliance. Accordingly, Plaintiffs' new theory should not be considered."  (*Id.*, Dkt. 86 at 33-34 (citations omitted).)

## E.    Present Motion to Amend

On August 17, 2020, Plaintiffs filed the present Motion, which was heard by the Court on September 11, 2020.

The present proposed third amended complaint[1] deletes Count VII for punitive damages in its entirety. It instead proposes to assert a claim for punitive damages under the fraud and fraud by omission common law claims. (Dkt. 68-2 at 31, 32.)[2]

The crux of the proposed amendments is focused on the alleged misrepresentations made by Defendants. In the operative Second Amended Complaint, it appears that Plaintiffs referred to representations made on FCI's website and its services and qualifications in terms of Plaintiffs' reliance on Defendants' misrepresentations, but did not assert that they were in of themselves misrepresentations. (Dkt. 63 *compare* ¶¶ 12, 16, *with* ¶¶ 18-19.)

With respect to the representations made to Plaintiffs, proposed amended paragraphs 12-13 insert modified representations made by Defendants that Johnson read on FCI's website:[3]

---

[1]    The Court notes that after Plaintiffs filed the present motion to amend, the parties filed a stipulation to amend the then-operative Amended Complaint to delete allegations regarding punitive damages that were inadvertently included by Plaintiffs in Count VII, which had been excluded by the Court. (Dkt. 60.) The Court granted the stipulation to amend and the operative Second Amended Complaint (Dkt. 63) was filed on July 8, 2020.

[2]    Except for depositions, all page numbers refer to the CM/ECF pagination.

[3]    The Court notes that the representations made by Cynkar to Plaintiffs regarding his qualifications and ILKB, as alleged in proposed amended complaint, remain essentially the same as those in the operative Second Amended Complaint. (Dkt. 68-2 at 20, 21-22.)

Through FCI's Representations about Its Services

12. Prior to going forward with FCI and Cynkar, Johnson reviewed the FCI website (https://www.franchoice.com/).)   FCI held itself out as directing prospective franchisees to "high quality franchise businesses that match your requirements" and that it would match "entrepreneurs like you with the perfect franchise business." FCI stressed that Plaintiffs could "avoid the confusion of researching" franchise opportunities and could focus on those franchises that FCI had "selected …as franchise businesses matching [his] requirements."  FCI further stated that "[t]hey will be by your side coaching you and making sure you are getting the information you need in order to make the best decision for you."

13.   Johnson was impressed by the fact that FCI ensured that the franchise opportunities it offered had been pre-screened as "high-quality franchise businesses" and would match him with "a franchise opportunity that will meet the specific needs of each individual."  Specifically, the FCI website stated:

    a. "You avoid the confusion of researching the overwhelming myriad franchise opportunities and can concentrate on those that have been pre-screened as high quality franchise businesses matching your requirements."   "At FranChoice, we've done much of the homework for

        you.   We have carefully pre-screened hundreds of franchise companies."

    b.  "We examine the record of the franchisor relating to litigation, failures and, most importantly, the satisfaction of the existing franchisees …We only want to work with the best."

    c.  FCI further stated that "We provide the information a potential franchisee needs to find the opportunity that fits their goals…."

The foregoing representations will be referred to herein as the "Services Representations." On the basis of the Services Representations and Cynkar's representations, the Johnsons decided to proceed with FCI's process of finding the "perfect" franchise for them.

\* \* \*

(Dkt. 68-2 at 20-21.)

As set forth above, another substantial proposed change deals with the new headers for two categories of representations: (1) "FCI's Representations about its Services", and (2) "Defendants' Representations about ILKB."  (*Id.*)

The remainder of the amendments deal primarily with the falsity of the representations. While the Second Amended Complaint already asserts that the representations at issue are false, the proposed amended complaint contains new facts regarding Defendants' alleged representations as to the services provided by FCI as stated on their website and by Cynkar:

<u>The Falsity of Defendants' Services Representations</u>

23.    After discovery of Defendants was conducted in this case, Plaintiffs learned that Defendants' Services Representations had been untrue:

a.  FCI did not "pre-screen" franchisors "carefully" to find "high quality" franchises. FCI screened franchisors only for the saleability of the franchise. FCI did not screen for the length of time the franchisor had been franchising, the experience of its staff and executives, the number of franchisees who had actually been operating for at least a year, the actual financial results of franchisees or any publicly available information about the franchisor, including its history of litigation or franchise law violations. FCI did not screen to determine if the franchisor was of "high quality."

b.  FCI did not examine the record of the franchisor with respect to litigation; at the time that Johnson purchased the ILKB franchise, ILKB had at least four lawsuits alleging fraud, theft of services or violations of franchise laws that should have been disclosed, but which were not, in its Franchise Disclosure Document; ILKB's founder and CEO had filed for bankruptcy, which also should have been disclosed, and ILKB or its predecessor had entered into consent orders with the states of New York and Minnesota with respect to violations of their franchise laws.

c.  Defendants' representation that they would "provide the information a potential franchisee needs to find the opportunity that fits their goals " was false. In addition to ILKB's history of litigation, FCI knew when Johnson was considering ILKB that its franchisees were complaining of lack of support; that ILKB's founder and CEO was calling franchisees "stupid, selfish and ungrateful;" and that ILKB had a history of using illegal sales tactics.

(*Id.* at 25-26.)

## II.    LEGAL STANDARD

Plaintiffs' Motion is generally governed by Rules 15 and 16 of the Federal Rules of Civil Procedure and Local Rule 16.3 of the Local Rules for the District of Minnesota.

**A.      Rule 15**

Federal Rule of Civil Procedure 15(a) provides that leave to amend "shall be freely given when justice so requires."  The determination as to whether to grant leave to amend is entrusted to the sound discretion of the trial court.  *See, e.g.*, *Niagara of Wis. Paper Corp. v. Paper Indus. Union Mgmt. Pension Fund*, 800 F.2d 742, 749 (8th Cir. 1986) (citation omitted).  The Eighth Circuit has held that "[a]lthough amendment of a complaint should be allowed liberally to ensure that a case is decided on its merits . . . there is no absolute right to amend."  *Ferguson v. Cape Girardeau Cty.*, 88 F.3d 647, 650-51 (8th Cir. 1996) (citing *Thompson-El v. Jones*, 876 F.2d 66, 67 (8th Cir. 1989); *Chesnut v. St. Louis Cty.*, 656 F.2d 343, 349 (8th Cir. 1981)).  Denial of leave to amend may be justified by "undue delay, bad faith on the part of the moving party, futility of the amendment or unfair prejudice to the opposing party."  *Sanders v. Clemco Indus.*, 823 F.2d 214, 216 (8th Cir. 1987) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

**B.      Rule 16**

Under Rule 15(a), leave to amend should be granted liberally, if "justice so requires."  However, the Eighth Circuit has held that when a party has filed a motion to amend the complaint after the deadline provided in a court's pretrial scheduling order, then the court may properly require, pursuant to Federal Rule of Civil Procedure 16(b), that good cause be shown for leave to file a pleading that is out of time with that order. *See Freeman v. Busch*, 349 F.3d 582, 589 (8th Cir. 2003) (citing *In re Milk Prod. Antitrust Litig.*, 195 F.3d 430, 437 (8th Cir. 1999)).  "If we considered only Rule 15(a) without regard to Rule 16(b), we would render scheduling orders meaningless and

effectively would read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure." *In re Milk Prod. Antitrust Litig.*, 195 F.3d at 437-38 (citation omitted).

Scheduling orders pursuant to Rule 16(b)(1) "assure[ ] that at some point both the parties and the pleadings will be fixed . . . ." Fed. R. Civ. P. 16(b), advisory committee's note to 1983 amendment. Moreover, "Rule 16(b) assures that '[a] magistrate judge's scheduling order 'is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded . . . without peril.'" *Archer Daniels Midland v. Aon Risk Servs., Inc.*, 187 F.R.D. 578, 582 (D. Minn. 1999) (quoting *Gestetner Corp. v. Case Equip. Co.*, 108 F.R.D. 138, 141 (D. Me. 1985)). Under Rule 16(b), "[a] schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). Similarly, Local Rule 16.3 requires a party moving to modify a scheduling order to "establish good cause" for the proposed modification. Further, regarding the timing of when such a motion must be made, Local Rule 16.3(d) states, "[e]xcept in extraordinary circumstances, before the passing of a deadline that a party moves to modify, the party must obtain a hearing date on the party's motion to modify the scheduling order. The hearing itself may take place after the deadline."

"The primary measure of good cause is the movant's diligence in attempting to meet the order's requirements." *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 716-17 (8th Cir. 2008) (citing *Rahn v. Hawkins*, 464 F.3d 813, 822 (8th Cir. 2006)); *see also* Fed. R. Civ. P. 16(b), advisory committee's note to 1983 amendment ("[T]he court may modify the schedule on a showing of good cause if it cannot reasonably be met despite

the diligence of the party seeking the extension."). "[T]he 'good cause' standard [of Rule 16(b)] is an exacting one, for it demands a demonstration that the existing schedule cannot be reasonably met despite the diligence of the party seeking the extension." *Scheidecker v. Arvig Enters.*, 193 F.R.D. 630, 632 (D. Minn. 2000) (citation omitted).

While the prejudice to the nonmovant resulting from modification of the scheduling order may also be a relevant factor, generally, the Court will not consider prejudice if the movant has not been diligent in meeting the scheduling order's deadlines. *See Bradford v. DANA Corp.*, 249 F.3d 807, 809 (8th Cir. 2001) (concluding that there was "no need to explore beyond the first criterion, [diligence,] because the record clearly demonstrate[d] that Bradford made only minimal efforts to satisfy the [scheduling order's] requirements"). In short, Rule 16(b) focuses on "the diligence of the party seeking to modify a Scheduling Order, as opposed to the litany of unpersuasive excuses, inclusive or inadvertence and neglect, which commonly undergird an untimely Motion to Amend." *Scheidecker*, 193 F.R.D. at 632 n.1 (citations omitted).

With these standards in mind, the Court turns to Plaintiffs' Motion.

### III.   ANALYSIS

Plaintiffs argue that good cause exists to allow what amounts to the fourth amended complaint on the grounds that the scheduling order called for motions to amend the pleadings to be brought by January 19, 2020 and Plaintiffs did not depose FCI's founder and CEO, Jeff Elgin ("Elgin") about the representations about FCI's services until February 6, 2020. (Dkt. 67 at 16.) Defendants counter that Plaintiffs had already learned the information that Plaintiffs claimed to have learned from Elgin and Cynkar by

13

November 19, 2019, through FCI's Rule 30(b)(6) depositions and written discovery.
(Dkt. 71 at 15-21.)

As a starting point, the Court does not comprehend why Plaintiffs waited until
November to start conducting depositions given the May 2010 Joint Discovery Plan,
*supra*.  While it appears that Defendants did not serve their responses to the May 2019
written discovery until the end of October 2019 (Dkt. 72-1), albeit approximately 2200
pages of documents were produced by Defendants in June of 2019 (Dkt. 72 ¶ 4), it was
incumbent on Plaintiffs to seek relief from the Court if they felt it was necessary to meet
their deadlines to amend the pleading, including those with respect to punitive damages.

In addition, there is no reason why Plaintiffs could not have previously made the
allegations in paragraph 13 of the proposed amendment or differentiated between the
types of representations—representations regarding Defendants' services versus
representations regarding ILKB—as they now seek to do.  This was information
obviously in the possession of Plaintiffs since the start of this action given that it stems
from Johnson's own observations and the characterization of his claims.  While it is not
entirely clear, it appears that Plaintiffs are arguing that the reason why they could not
allege fraud as to these representations is that they did not have enough evidence to
determine that Defendants' representations were false for the purposes of the particularity
requirement of Rule 9(b):

> [W]hile Plaintiffs believed that Defendants' representations about their
> services were misrepresentations, Plaintiffs did not have the evidence to meet
> the pleading requirements of Rule 9(b). Specifically, until it could be
> determined that FranChoice had not (a) pre-screened franchisors for quality
> or safety; (b) examined the record of the franchisor for litigation; or (c) had
> information that should have been provided to Johnson in order to make his

14

decision. Plaintiffs did not believe they could, in good faith, allege fraud consistent with the requirements of Rule 9(b).

(Dkt. 67 at 17.) Plaintiffs claim that only in February 2020 were they able to conduct the individual deposition of Elgin, where Plaintiffs learned that "that FranChoice had done no review of ILKB as of the time of Johnson's purchase; that their 2013 review had done nothing to ensure any type of 'safe' or 'high-quality' franchise; and that they had done no examination or review of ILKB's litigation record." (Dkt. 67 at 19.)

It is difficult to comprehend why Plaintiffs needed to shore up the particularity of their fraud-related claims for the purposes of Rule 9(b). The amended allegations in proposed paragraph 13 are not materially different from the original allegations, primarily using different language from the website or rephrasing the allegations and, more importantly, now actually characterizing the representations relating to the services Defendants provided as misrepresentations in their own right, as opposed to the basis of Plaintiffs' reliance on Defendants' representations as it is presently alleged.

Instead of the proffered reason for the amendments, it appears that this late-proposed amendment was the result of a tactical decision by Plaintiffs to address the possible deficiency in their fraud-related claims regarding the extent of the actionable misrepresentations involved, given the arguments made by FCI in opposition to the plaintiffs' motion for partial summary judgement in the earlier related *Mount Holly* case, *see supra*, and to get another bite at the proverbial apple with respect to the extent of punitive damages, given the Court's Order denying part of their motion to amend to add punitive damages. However, such a tactical decision after the expiration of a deadline to amend does not amount to an extraordinary circumstance to bring the present untimely

motion, let alone establish diligence for the purposes of the good cause requirement of

Rule 16.  *See Morrison Enter., LLC v. Dravo Corp.*, 638 F.3d 594, 610-11 (8th Cir. 2011)

(affirming district court's denial of motion for leave to amend on ground that a tactical

choice not to pursue a claim earlier did not show diligence); *see also Aviva Sports, Inc. v.*

*Fingerhut Direct Mktg., Inc.*, 09-cv-1091 (JNE/JSM), 2010 WL 4193076, at *7 (D. Minn.

Oct. 7, 2010) ("A strategic decision at the beginning of the case to not allege a MUTPA

claim, because Aviva did not believe it had a basis for punitive damages at that time, does

not constitute good cause for seeking the amendment now."); D. Minn. LR 16.3(d).

In any event, even to the extent that the knowledge of the fraud needed to be

pleaded with particularity, *see Drobnak v. Andersen Corp.*, 561 F.3d 778, 783-84 (8th

Cir. 2009) ("[W]hen the facts constituting the fraud are peculiarly within the opposing

party's knowledge . . . such allegations may be pleaded on information and belief."), the

Court concludes that Plaintiffs had sufficient information regarding the Defendants'

screening process as a set forth in paragraph 23 of the proposed amended complaint as of

November 2019, well prior to the January 2020 motion to amend deadline.  Specifically,

during the November 18, 2019 FCI Rule 30(b)(6) deposition, Elgin testified that when

determining whether a franchisor met their "exacting standards," this determination did

not specifically include looking at a litigation history, although FCI used this factor to

determine whether to refer a franchise, and did include looking at a franchisor's franchise

disclosure documents ("FDD") to see if there are were bankruptcies or litigation history,

and, if there were, to ask the franchisor questions about this.  (Dkt. 72-1, Ex. G at 49.)

Other factors considered were the period of time that a franchisor was in operation (there

16

was not a minimum amount of time required), whether the franchisees were happy, and

whether there were territories available.  (*Id.* at 50-51, 54.)  They also looked to the

franchisor's financials, as one of the many factors considered.  (*Id.* at 53.)  With respect

to FCI screening opportunities, Elgin testified:

> Q.     Okay.  This exhibit also refers to "pre-screened as high quality
> franchise businesses."
>
>         What does "pre-screened" mean?
>
> A.     We prescreen franchisors, it means basically four things.  We review
> their FDD document, we conduct interviews with management executives at
> the franchise company, we conduct interviews  with existing franchisees, and
> we  either through interviews or through material review will see if they have
> a   good  communication   system,  documentation   system   for   their
> communication with prospective franchisees.

(*Id.* at 55.)  FCI's other Rule 30(b)(6) deponent, Trent Halvorson ("Halvorson"), FCI

Vice-President of Franchise Relations, testified on November 19, 2019 that FCI's

screening criteria involved looking for "happy franchisees" and talking with several

franchisees, looking at their current sales process, obtaining information from franchisees

as to whether there was strong unit economics, looking at some marketing materials, and

reviewing the FDD.  (Dkt. 72-2, Ex. I at 41-49, 53.)  In addition, Halverson testified that

FCI did not have in place any sort of standard regarding how long a franchisee would

need to be in business to be included as part of the validation process for onboarding a

franchise like ILKB.  (*Id.* at 116-17.)

As the screening relates to the FDD, Elgin testified that he "quickly reviewed the

FDD and highlighted a few items" he wanted to talk about with Michael Parrella.  (Dkt.

72-1, Ex. G at 56.)  Halvorson testified that he focused primarily on items 3 and 20 of an

FDD as part of his evaluation.[4]  (Dkt. 72-2, Ex. I at 53.)  Moreover, as to the FDD, Elgin testified that the FDD of a franchisor is not reviewed again after the initial "pre-screening."  (Dkt. 72-1, Ex. G at 56-57.)  Elgin also testified that information from its prescreening does not generally go to its consultants, such as Cynkar, that the FDD is not provided to the consultants, and that it is not recommended by FCI that the consultant obtain a copy of the FDD.  (*Id.* at 67.)

With regard to bankruptcy and litigation history, Halvorson testified in November 2019 that he had reviewed the ILKB 2013 FDD and had read the item disclosing that Parrella had a bankruptcy in 2003 and that the order of discharge was revoked in January 2008, but did not understand what that meant.  (Dkt. 72-2, Ex. I at 61-62.)  The only other inquiry made regarding the bankruptcy was that Halvorson asked Parrella about the bankruptcy, and Halvorson relied on Parrella's representation that "its taken care of." (*Id.* at 62.)  Halverson also testified that he took the representation in the FDD that there was no litigation at face value with no further follow-up.  (*Id.* at 68.)  He further testified that the only other time that FCI looked at an FDD for ILKB was when there were increases in ILKB franchise fees (on two separate occasions).  (*Id.* at 135-36.)  Halverson also noted in conjunction with the increases in franchise fees that FCI received a commission with respect to a sale of an ILKB franchise.  (*Id.* at 136-37.)

As set forth above, by November 2019, Plaintiffs had information regarding Defendants' screening process or lack thereof, the application of the screening process as

---

[4]     The ILKB 2013 FDD Item 3 related to litigation and Item 20 related to outlets and franchisee information.  (Dkt. 68-2 at 50.)

it related to ILKB, FCI's evaluation of the FDD (including the bankruptcy and litigation history), and the fact that the FDD was not shared with its agents, such as Cynakar.

Moreover, the FDDs relied upon by Plaintiffs, the litigation related to ILKB, and the discharge of Parrella's bankruptcy were all available to Plaintiffs well before the January 18, 2020 motion to amend deadline, as the FDDs were produced by November 2019, the bankruptcy discharge had been previously used by Plaintiffs in their initial motion to amend to add punitive damages in October 2019, and the records were otherwise publicly available for a period from 2013 through 2017.  (*See* Dkt. 73 ¶¶ 4-5, 7, 13-14.)  Indeed, the litigation, the bankruptcy, and Defendants' lack of due diligence in discovering this information, given its public availability, are all referenced in the initial Complaint.  (Dkt. 1 ¶ 23.)

In sum, while some evidence may have been available after the January 18, 2020 cut-off for motions to amend, the key evidence on which Plaintiffs rely was available months before the motion to amend deadline expired.  Consequently, the failure of Plaintiffs to move to amend for more than half a year (or to seek an extension of time to amend) demonstrates a lack of diligence incompatible with good cause under Rule 16. *See Moldex Metric, Inc. v. 3M Co.*, No. CV 14-1821 (JNE/FLN), 2016 WL 845264, at *2 (D. Minn. Mar. 4, 2016) ("Although documents were produced and depositions took place after July 1, a substantial portion of the evidence on which Moldex Metric relied to support its second motion was available to it months before July 1.  Moldex Metric could have presented the essence of its second motion to amend to claim punitive damages by July 1.  Its failure to do so reveals a lack of diligence that is incompatible with a finding

19

of good cause."); *see also Aviva*, 2010 WL 4193076 at *7 ("[W]hile it is true that the depositions of Kalleymeyn and Harris were taken shortly before Aviva brought its motion to amend, it is also uncontroverted that Aviva knew virtually the same facts it learned at these depositions when it obtained [a declaration] . . . in April 2010 . . . .").

Further, any assertion by Plaintiffs in proposed paragraph 28 that they only learned that FCI knew as of 2015 of alleged illegal marketing activities no earlier than February 2020 is disingenuous.  Plaintiffs do not reference the authority they rely on with respect to FCI's knowledge of alleged illegal marketing.  As best as this Court can discern, this allegation is based on a March 31, 2015 email chain between Jeff Elgin and Scott Ferrari at ILKB regarding issues with video marketing outside of an FDD, which was produced in Defendants' first set of discovery responses in June 2019. (Dkt. 72 at ¶ 6).  Indeed, this email exchange was an exhibit to Plaintiffs' October 1, 2019, Motion to Amend the Complaint to include a claim for punitive damages (Dkt. 34-1 at 99-100), and therefore the evidence needed to make this allegation in good faith was available even before the October 2019 deadline for motions to amend to assert claims for punitive damages.

Even if Plaintiffs first learned of sufficient facts to bring the present proposed amendments by February 2020 as claimed, that does not explain why Plaintiffs waited until the middle of August 2020 to file the present Motion with the respect to the scope of their misrepresentation-related claims or with respect to their claim for punitive

damages.[5]  Plaintiffs appear try to justify their failure to file the present Motion earlier in part by pointing to the fact that this Court ruled on their motion to amend to add punitive damages on May 7, 2020, which Judge Davis affirmed on June 16, 2020.  (Dkt. 67 at 17.)  However, even accepting this assertion at face value, considering the expiration of the motion to amend deadline in January 2020, it was incumbent on Plaintiffs to take steps to protect their interests and comply with the mandates of the pretrial scheduling order by at least seeking a motion to extend the deadline to amend the pleadings to sometime after the Court's order on punitive damages, similar to what was initially set forth in the initial Scheduling Order (Dkt. 37) with respect to the motion to amend deadline and the then-pending Report and Recommendation on Defendants' partial motion to dismiss.  *See AGA Med. Corp. v. W.L. Gore & Assocs., Inc.*, No. CV 10-3734 (JNE/JSM), 2012 WL 12888665, at *7 (D. Minn. Oct. 5, 2012) ("Even accepting this assertion at face value, considering that the acquisition had been completed over a year prior to the effective date of the licenses, it was incumbent on both AGA's corporate representatives and its litigation counsel, to take steps to protect the rights of the proposed St. Jude plaintiffs and

---

[5]    Even assuming that Plaintiffs met the good cause requirement, the Court agrees with Defendants that the proposed amended claim for punitive damages is futile.  While Plaintiff asserts that Defendants knowingly made misrepresentations regarding FCI's screening services, including those related to pending litigation (Dkt. 68-2 at 25-26, ¶ 23), these alleged actions of Defendants on their face only plausibly allege at most what amounts to gross negligence on the part of Defendants as to their duty to Plaintiff.  However, the mere showing of negligence, even gross negligence, is not sufficient to sustain a claim of punitive damages.  *See Ulrich*, 848 F. Supp. at 868.  Indeed, these allegations are similar to those previously rejected by the Court in the Plaintiff's first motion to amend as part of their proposed Count VII.  (*See supra* at I.C.)  Similarly, the Court rejects the assertion of the viability a punitive damages claim based on knowledge that ILKB's CEO was calling franchisees "stupid, self and ungrateful" for the same reasons set forth in this Court's previous Order.  (*See supra* at I.C.)

comply with the mandates of the pretrial scheduling order, L.R. 16.3 and Rule 16.").

"This lack of action [by Plaintiffs] may be careless, inadvertent, strategic or due to other

pressing matters, but it does not amount to the requisite due diligence needed to bring the

present motion." *Id.* (citing *C.H. Robinson Co. v. Zurich Am. Ins. Co.*, Civ. No. 02–4794

(PAM/RLE), 2004 WL 1765320 at *1 (D. Minn. Aug. 05, 2004), quoting *N. Star Mut.*

*Ins. Co. v. Zurich Ins. Co.*, 269 F. Supp. 2d 1140, 1144 (D. Minn. 2003)) ("Carelessness

does not excuse dilatoriness and 'offers no reason for a grant of relief.'").

    For all of the reasons stated above, Plaintiffs' Motion is denied.

## IV.    ORDER

    Based on the files, records, and proceedings herein, **IT IS ORDERED THAT**:

Plaintiffs' Motion to Amend Complaint (Dkt. 65) is **DENIED**.


DATED: November 25, 2020                  *s/Elizabeth Cowan Wright*
                                          ELIZABETH COWAN WRIGHT
                                          United States Magistrate Judge